IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| GERALD WILLIAM GLASGOW, ) | Civil Action No. 3:09-2065-RMG-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **REPORT AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, COMMISSIONER ) | |
| OF SOCIAL SECURITY ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the Court pursuant to Local Rule 83.VII.02, et seq., D.S.C., concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff filed applications for SSI and DIB on August 28, 2003, alleging disability since October 11, 2002.[1] Plaintiff's applications were denied initially and on reconsideration, and he requested a hearing before an administrative law judge ("ALJ"). After a hearing held on December 7, 2004, the ALJ issued a decision denying benefits and finding that Plaintiff was not disabled. The Appeals Council granted Plaintiff's request for review and remanded the case to the ALJ for further consideration of Plaintiff's physical impairments. (Tr. 60-63). Following a second administrative hearing on November 15, 2007, the ALJ issued a decision on February 28, 2008 finding that Plaintiff

---

[1]This onset date was amended at the hearing from February 19, 2002 to October 11, 2002.

was not disabled within the meaning of the Act (Tr. 27-36) because under the medical-vocational guidelines (the "Grids") promulgated by the Commissioner, Plaintiff remains able to perform work found in the national economy. See 20 C.F.R., Part 404, Subpart P, Appendix 2.

Plaintiff was fifty-two years old at the time of the ALJ's decision. He has an eleventh grade education with past relevant work as a "resource" truck loader, forklift driver, escort driver and construction worker. (Tr. 563-565).

The ALJ found (Tr. 29-36):

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since October 11, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.971 *et seq*.).

3. The claimant has the following severe impairments: degenerative disc disease and a right hip condition (20 CFR 404.l520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of unskilled light work. Specifically, the claimant is able to lift and carry up to 20 pounds occasionally and 10 pounds frequently and stand, walk, and sit for 6 hours in an 8-hour day.

6. As a result of his residual functional capacity as described above, the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 1, 1955 and was 46 years old (a younger individual) on his alleged onset date. On November 1, 2005, he became 50 years old, which is defined as an individual closely approaching advanced age. He is currently 52 years old (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 11, 2002, through the date of this decision (20 CFR404.1520(g) and 416.920(g)).

On June 17, 2009, the Appeals Council denied Plaintiff's request for review, making the decision of the ALJ the final action of the Commissioner. Plaintiff filed this action on August 5, 2009.

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971) and Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." See 20 C.F.R. § 404.1505(a) and Blalock v. Richardson, supra.

## MEDICAL RECORD

Plaintiff complained to Dr. Gordon Thompson at Palmetto Primary Care Physicians about breathing problems in May 2002. Dr. Thompson prescribed Advair and Combivent. Tr. 463-466.

A test for asthma and COPD administered by Dr. Sola Kim revealed "mild obstruction." Tr. 427, 455. Despite respiratory problems, Dr. Thompson reported that Plaintiff continued to smoke. See, e.g., Tr. 453, 461.

On October 14, 2002, Plaintiff returned to Dr. Thompson with complaints of dull right hip and groin pain. Dr. Thompson's examination revealed that Plaintiff had pain with internal and external rotation of his right hip. Lortab was prescribed for pain. Tr. 453-454. A nuclear medicine bone scan in October 2002 revealed degenerative changes in Plaintiff's neck and shoulder and "no abnormality in the region of the right hip." Tr. 425.

Dr. David Jaskwhich, an orthopedist, examined Plaintiff on October 31, 2002. He noted that x-rays revealed a right hip lesion. Dr. Jaskwhich opined that the lesion had "a benign appearance on x-ray," but ordered a CT scan which revealed "probably bone island in the femoral neck and a probable lipoma [benign fatty tumor]." Tr. 404-406, 420.

Plaintiff complained of pain to Dr. Thompson on November 13, 2002. Dr. Thompson noted that orthopedics reported that Plaintiff's hip was "normal," and that a CT scan of Plaintiff's lower extremity was negative. He thought that Plaintiff had a pinching of the nerve that supplies sensation to the outer portion of the thigh and peripheral neuropathy. Tr. 189. He opined that Plaintiff was "fine to return to work on light duty." Tr. 190. A November 19, 2002 MRI revealed a 1.8 centimeter "well circumscribed lesion within the subtrochanteric right femur." Tr. 419.

On December 6, 2002, Plaintiff was examined by Dr. Mike Tyler, a neurosurgeon. Dr. Tyler noted that Plaintiff walked with an antalgic gait. Straight leg raising was negative on the left, but produced fairly severe pain in Plaintiff's back, right hip, and anterior thigh on the right. An MRI of

4

Plaintiff's lumbar spine revealed some degenerative changes at L5-S1, but Dr. Tyler thought that it showed nothing to account for Plaintiff's symptoms. He recommended further testing. Tr. 437-438.

Plaintiff was examined by Dr. Tyler again on January 2, 2003. Dr. Tyler noted that a thoracic MRI revealed a small disc protrusion at T7-8 on the left, on the opposite side of his pain. See Tr. 416, 434. EMG and nerve conduction studies "revealed some changes consistent with some chronic degenerative changes in the right vastus lateralis [the largest part of the quadriceps muscle]." Tr. 434. A myelogram CT was normal at the thoracic level and demonstrated "a very mild anterior extradural defect at L5-S1." Tr. 414. On January 28, 2003, Dr. Taylor stated that he had "no explanation of [Plaintiff's] continued complaint of pain and I have nothing to offer him from a neurosurgical point of view." Tr. 429.

On February 18, 2003, Dr. Thompson noted that Plaintiff's nerve conduction study:

showed abnormal conduction going to the muscle which has atrophied. Dr. Lucas who performed this test indicated to me that there must be a mechanical compression of this nerve even though it is outside the spinal canal. The severe pain in the inguinal area is from the compression of the anterior [superficial] femoral [cutaneous] nerve.

Tr. 193. Dr. Thompson's examination revealed that Plaintiff had pain with palpation over the right thigh and thigh atrophy, with strength of 4/5 on the right. Tr. 194.

On June 26, 2003, Plaintiff complained to Dr. Jeffrey Faaberg at the Crowfield Pain Center about lower back, right hip, and right leg radicular pain. Plaintiff reported the pain varied from four to ten on a scale of one to ten depending on his activity. Dr. Faaberg's examination revealed that Plaintiff had decreased strength and atrophy of his thigh muscles, decreased sensation, and diminished deep tendon reflexes on the right. He noted that Plaintiff's affect was flattened and Plaintiff complained of pain throughout the entire interview while shifting his weight to the left. Dr.

Faaberg said that Plaintiff suffered from motor weakness and muscular atrophy to the right upper extremity which he thought might represent a peripheral nerve injury. He said that Plaintiff had a significant loss of range of motion of the lumbar spine with sensory and reflex changes. Dr. Faaberg assessed Plaintiff with a fourteen percent regional impairment to his cervical spine, a ten percent regional impairment to his right lower extremity, and a thirteen percent regional impairment of his lumbar spine. Tr. 470-474.

In December 2003, Dr. Judith Von, a state agency psychologist, completed a psychiatric review technique form. Dr. Von opined that Plaintiff did not have a severe mental impairment. Tr. 479-484.

On May 4, 2004, Plaintiff was examined by Dr. Ray Hodges, a psychiatrist. Dr. Hodges noted that Plaintiff had a depressed affect, was frequently near tears, and displayed some mild short-term memory and concentration disturbances during the examination. Dr. Hodges diagnosed depression, with a resurgence of major depressive symptoms since Plaintiff discontinued his antidepressants (because his insurance ran out and he could not afford it). It was noted that Plaintiff suffered from sleep disturbances, diminished appetite, and loss of interest in life with suicidal ideation including a loose plan to hang himself, but said he did not want to traumatize his wife that way. Dr. Hodges opined that Plaintiff had a reasonably good prognosis for his emotional distress and depression if he received antidepressant medications and possibly psychotherapy. Tr. 485-487.

On June 28, 2004, Dr. Patrick Jarrell, a state agency psychologist, completed a psychiatric review technique form and a mental residual functional capacity ("RFC") assessment. He opined that Plaintiff had mental limitations of only a moderate ability to complete a normal workday or

workweek without interruptions from psychologically based symptoms and moderate ability to perform at a constant pace without an unreasonable number and length of rest periods. Tr. 504-522.

Plaintiff was examined by Dr. Marcus Schaeffer on June 15, 2004. Plaintiff reported that he had breathing problems, back pain, vision problems, and a hernia. It was noted that Plaintiff smoked half a pack of cigarettes per day. Dr. Schaeffer's examination revealed that Plaintiff's lungs were clear, with no wheezes, rhonchi, rales, or rubs; Plaintiff moved in a very slow and cautious way; he used a cane; and he hung onto the examining table. Plaintiff had a limited neck range of motion (2/5), normal deep tendon reflexes "though he does suppress them," and "a minimal hand grasp strength, not consistent with anatomy or physiology." Dr. Schaeffer noted that Plaintiff had an "overreaction to touch in the neck and low back area"; his gait and movement were not physiologic; and he used a cane (which showed little wear) on his right side for his right lower extremity. There was difficulty assessing any true musculoskeletal problem because of Plaintiff's limited cooperation. Dr. Schaeffer thought that Plaintiff's mood and affect were "unremarkable," and that Plaintiff's breathing, hernia, and vision problems did not appear to significantly limit Plaintiff. He thought that Plaintiff should be limited to light work involving lifting or moving twenty pounds or less. Dr. Schaeffer concluded that Plaintiff's back and neck complaints were not "physiologic," but that he could not exclude that Plaintiff had some complaints of pain in those areas. Tr. 488-491.

On June 24, 2004, Dr. Katrina Doig completed a physical RFC assessment. She opined that Plaintiff could perform a range of medium work, with restrictions of only occasional climbing. Tr. 496-503.

7

Plaintiff received treatment at the Franklin Fetter Family Health Center ("Fetter FHC") between May 2004 and January 2005. The notes are difficult to read, but it appears that Plaintiff complained of breathing problems and pain in his neck and back. Tr. 159-167.

Plaintiff began treatment with Dr. Kevin Coleman at the Necedah Family Medical Center in Wisconsin on September 29, 2005.[2] He was following up after an emergency room visit for right flank pain with radiation into his testicles. Dr. Coleman's examination revealed that Plaintiff had superficial pain on palpation along the inguinal ligament, negative straight-leg raise testing, and no evidence of significant muscle weakness. Dr. Coleman prescribed Neurontin. Tr. 137. Approximately a week later, Dr. Colman assessed Plaintiff's right inguinal radiculopathy, noting that the "[q]uestion is whether or not it is from a herniated disc in the back or any type of back dysfunction...versus ilioinguinal nerve entrapment." He prescribed Lortab for pain. Tr. 136.

A couple of weeks later, on October 25, 2005, Plaintiff returned stating that his sister stole his medication. He was given a two-day supply of Lortab to get him through until Dr. Coleman could examine Plaintiff. Dr. Coleman noted that Plaintiff's October 2005 MRI was "essentially negative, diagnosed neurapraxia[3] (a bruised peripheral nerve) of the right inguinal region, and recommended nerve blocks. Tr. 134.

---

[2]Plaintiff moved from South Carolina to Wisconsin at some point between January and September 2005.

[3]Neurapraxia is defined as:
The mildest type of focal nerve lesion that produces clinical deficits; localized loss of conduction along a nerve without axon degeneration; caused by a focal lesion, usually demyelinating, and followed by a complete recovery. Term is often misspelled (neuropraxia), and often used, incorrectly, as a synonym for nerve lesion.
Stedman's Medical Dictionary 1206 (27th ed. 2000).

8

On November 21, 2005, Dr. Coleman opined that Plaintiff could lift and carry ten pounds frequently; sit and stand/walk at least two hours in an eight-hour day; needed to alternate positions frequently; and could work only two hours per day, five days per week. He indicated that these restriction expired in three months. Tr. 65-66.

Plaintiff was treated by Dr. Colman on December 13, 2005, and January 24, 2006 for ongoing problems with right inguinal pain. Dr. Coleman noted that Plaintiff had been set up to have a nerve block by two different specialty clinics, but they were unable to accept him because he did not have insurance. Tr. 132-133.

In February 2006, Dr. Coleman completed paperwork from Plaintiff's attorney. He opined that Plaintiff was disabled as a result of presumed neurapraxia; that Plaintiff could only sit for two hours per day; could stand/walk for one hour per day; could occasionally lift and carry up to ten pounds; had minimal restrictions on using the upper extremities; and could not kneel, bend, or stoop. Tr. 131, 181-187.

Plaintiff returned to Dr. Coleman on April 18, 2006, at which time he complained of pruritus (itching), nodules on his back, and having run out of Lortab. Dr. Coleman diagnosed "Picker's nodules, likely secondary to narcotic withdrawal as he is running through his medication." Tr. 129. On May 25, 2006, Dr. Coleman gave Plaintiff thirty days to find a new doctor because Plaintiff continued to take excessive amounts of Lortab despite repeated urging that Plaintiff not take medication in excessive amounts. Dr. Coleman also noted that Plaintiff failed to show up for three appointments in two months. Tr. 128.

Plaintiff returned to South Carolina and to the Fetter FHC in July 2006. See Tr. 153-158. In November 2006, Dr. Cynthia Jones of Fetter FHC noted that Plaintiff had tenderness over his

9

thoracic and lumbar vertebrae. Plaintiff complained of increased burning in both hips with prolonged standing and walking. On December 15, 2006, after Plaintiff returned to the Fetter FHC because he ran out of his pain medication, a licensed practical nurse there noted that they:

> discussed his med use, namely that he was averaging over 9 tablets a day and was expected to use the prescription sparingly until able to get assistance from Dr. Greer. [Plaintiff] was advised that is current behavior could prompt a provider to consider him a "narcotics seeker"-type patient and that he needed to be very cautious in his use of pain medicine.

Tr. 148.

Approximately a month after being involved in a motor vehicle accident in which he strained his left shoulder and jammed his right middle finger, Plaintiff returned to Dr. Jones on April 10, 2007. Plaintiff requested that Dr. Jones complete disability paper work. She explained that she did not do disability physical examinations, but would complete what paperwork she could. Tr. 152. About a week later, Dr. Jones completed a "Pulmonary Impairment Questionnaire" in which she did not diagnose a pulmonary impairment, but opined that Plaintiff had low back pain based on tenderness in the paraspinal lumbar muscles and "difficulty walking due to pain, per patient." She also noted that Plaintiff had difficulty sleeping, walking, and standing for extended periods of time; hip pain at times; and irritability, hopelessness, and depression. Dr. Jones did not opine as to Plaintiff's exertional abilities, but thought that pain would frequently interfere with his attention and concentration, such that he would have to take unscheduled breaks and would miss work more than three times per month. She also noted that Plaintiff had side effects from his medications which included impaired concentration, irritability, nausea, and drowsiness/sleepiness. Tr. 43-49.

Emergency Room records reveal that from November 2004 to September 2006, Plaintiff was treated on at least seven occasions for a pain condition. Narcotics were prescribed. Tr. 210-302.

10

On July 20, 2007, Dr. Jones wrote a letter about Plaintiff's treatment in which she noted that Plaintiff described chronic back and right hip pain, and he had been diagnosed with COPD. She said he was referred to a local county mental health facility, but he "did not heed advisement to start counseling with mental health, or to continue counseling as long recommended by mental health." She said that Plaintiff was unable to secure the care of a pain management physician because of his "lack of finances." Tr. 196-197.

Plaintiff was examined by Dr. Alfred Broadhead at the Family Medical Center on February 29, 2008. He was diagnosed with chronic pain, COPD, and nicotine dependence. It was noted he smoked a pack of cigarettes per day and drank 15 cups of coffee a day. Tr. 546. Plaintiff continued to complain of neck, spine, shoulder, and right leg pain to care providers at the Family Health Center until July 2008. Tr. 538-545.

## **HEARING TESTIMONY**

At the 2004 hearing, Plaintiff elected to go forward without counsel. He testified that he injured his shoulder while working at a job preparing trucks for drivers by loading them with lumber, securing chains, and generally keeping up the truck yard. Tr. 563-564. He returned to work until October 2002, at which time Dr. Thompson "took" him out of work. Tr. 564. Plaintiff stated that he injured his neck, back, and right hip but his insurance ran out before he could get adequate treatment. Tr. 566-567. He said that his treatment consisted of taking medication to treat the symptoms. Plaintiff said that neck pain prevented him from being able to turn his head, he had headaches, and he had hip and lower back pain after walking less than a significant distance. Tr. 568. He was taking Zoloft for depression, which he testified had not improved. Tr. 568-569. Plaintiff said

that pushing and pulling exacerbated his pain, and lying flat on his back relieved it somewhat. Tr. 570.

At the November 2007 hearing (at which he was represented by counsel), Plaintiff said that he could not work because of back and right hip pain. He testified that he had some disks in his back that were "messed up" and his right hip had "nerve damage." Tr. 582. He reported that he could sit for twenty to twenty-five minutes at a time and stand for thirty to thirty-five minutes at a time. Tr. 582-583. Plaintiff said he had difficulty breathing from COPD and emphysema. Tr. 585. He also said he was involved in a motor vehicle accident in February 2007 during which he sustained injuries to the ligaments and muscles of his left shoulder. Tr. 585.

## **DISCUSSION**

Plaintiff alleges that the ALJ's decision was not based on substantial evidence because: (1) the ALJ failed to properly consider all of his impairments; (2) the ALJ erred in not finding that he met the listings of impairments ("Listings"), 20 C.F.R. Pt. 404, Subpt. P, App. 1 at § 11.14 or 1.04; (3) the ALJ failed to properly consider the combined effect of Plaintiff's multiple impairments; and (4) the ALJ erroneously rejected opinion evidence. The Commissioner contends that the final decision that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence[4] and free of reversible legal error.

---

[4]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

    A.    <u>Listings</u>

Plaintiff alleges that the ALJ failed to conduct a proper listing analysis because he did not identify the listing relevant to his inguinal neurapraxia (§ 11.14). He also argues that "the ALJ's listing analysis as to Mr. Glasgow's degenerative disc disease is alarmingly insufficient" because the ALJ only "parroted the listing requirements and simply moved on." Plaintiff's Brief at 11. The Commissioner contends that because Plaintiff does not even arguably meet these listings, any error was harmless.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). It is not enough that the impairments have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment. 20 C.F.R. § 404.1525(d); <u>see</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 and n. 5 (1987)(noting the claimant has the burden of showing that his impairment is presumptively disabling at step three of the sequential evaluation and that the Act requires him to furnish medical evidence regarding his condition). The Commissioner compares the symptoms, signs, and laboratory findings of the impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. Medical equivalence can be found if the impairment(s) is/are at least equal in severity and duration to the criteria of any listed impairment. 20 C.F.R. § 404.1526(a). A claimant has to establish that there was a "twelve-month period...during which all of the criteria in the Listing of Impairments [were] met." <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 847 (9th Cir. 1991)(finding that the claimant's back impairment did not meet the requirements of section 1.05C; remanded on other grounds).

13

Merely "coming close" to meeting a listing is not enough to establish equivalence, and a claimant cannot establish equivalence merely by showing that the overall functional impact of his combination of impairments was as severe as that of a listed (i.e. presumptively disabling) impairment. See Zebley, 493 U.S. at 531. Instead, the claimant must present medical findings equal in severity to every criterion in a listing. See id.

The ALJ's finding that Plaintiff failed to meet or equal any of the Listings is supported by substantial evidence. Plaintiff argues that the ALJ erred by not discussing the Listing at § 11.14. He argues that he meets this listing because Dr. Coleman diagnosed him with neurapraxia (with a differential entrapment of the superficial femoral cutaneous nerve versus inguinal nerve) based on EMG studies and physical examination (Tr. 181); noted that Plaintiff had pain with radiation from his right inguinal region which was burning, constant, and exacerbated by movement (Tr. 182); and concluded that Plaintiff could not kneel, bend, or stoop (Tr. 182). Plaintiff argues that this represents a "persistent disorganization in motor function." Review of the ALJ's decision, however, reveals that he specifically found that Plaintiff's inguinal neurapraxia did not constitute a severe impairment because it did not persist and was not expected to persist for at least twelve months as it was treated by Dr. Coleman and seemed to resolve in less than a year. He also wrote that treatment notes indicated that the condition generally improved with the use of medication and that objective tests (CT scanning in August 2005 and testicular ultrasound in October 2005) were generally unremarkable. Tr. 31. Thus, Plaintiff fails to show that the alleged condition which he thinks should be evaluated under Listing 11.14 existed for at least 12 months.

Further, Plaintiff has simply not presented any evidence to show that he met or equaled the Listing at § 11.14 such that any failure to consider this listing is harmless. See Russell v. Chater, 60

14

F.3d 824, 1995 WL 417576, at *3 (4th Cir. 1995)[Table](Cook v. Chater "does not establish an inflexible rule requiring an exhaustive point-by point discussion in all cases"); Ketcher v. Apfel, 68 F.Supp.2d 629, 645 (D.Md. 1999)("the duty of identification of relevant listed impairments and comparison of symptoms to Listing criteria is only triggered if there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments."). This section requires a claimant to show peripheral neuropathy "[w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. Section 11.04B describes this as a "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." Id., § 11.04B. This is further defined as:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

Id., § 11.00(C). Plaintiff fails to show that an inability to kneel, bend, or step represents a "significant and persistent disorganization of motor function" as he has not identified any paresis or paralysis, tremor or other involuntary movements, and/or ataxia and sensory disturbances, which occur singly or in various combinations as required by § 11.00C. Even if Plaintiff has shown disorganization of motor functioning, he has only shown it on one side (the right) and fails to show it in the required two extremities.

15

The ALJ also properly found that Plaintiff did not meet any of the Listings at § 1.00. Although Plaintiff argues that he met the Listings at § 1.04 (disorders of the spine), he fails to show any evidence that he suffered from a nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis which resulted in pseudoclaudication as required by this listing. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

B.     Opinions of Treating Physicians and Consultative Physician

Plaintiff argues that the ALJ erroneously rejected opinion evidence because he failed to properly evaluate the opinions of his treating physicians Dr. Coleman and Dr. Jones,[5] and the consultative opinion of Dr. Hodges. He asserts that these opinions support each of the other opinions cited as well as his own testimony. The Commissioner contends that the ALJ properly discounted these medical source opinions.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

---

[5]Plaintiff refers to this physician as Dr. "James," but it appears that the correct spelling of her last name is "Jones."

16

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527. Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

Here, the ALJ failed to address Dr. Jones' (or James) opinion at all. Thus, it is impossible to determine whether her opinions of disability were properly considered. Although the ALJ did discuss part of Dr. Coleman's opinion (see Tr. 31 and 34), he did not address Dr. Coleman's comments concerning Plaintiff's mental impairment of depression (see Tr. 186) and it is unclear in light of the ALJ's failure to consider Dr. Jones' opinion if his analysis concerning Dr. Coleman's opinion would be the same in light of all the evidence. Dr. Hodges' evaluation and comments are not entitled to controlling weight because he was not a treating physician.[6] It may, however, provide support to the opinions of Drs. Jones and Coleman. Thus, it is recommended that this action be remanded to the Commissioner to properly address the opinion evidence of Plaintiff's treating and consultative physicians in light of applicable law. As it appears that the ALJ did not consider all of the evidence, it is not possible to conclude that his determinations as to the severity of Plaintiff's

---

[6]The opinion of a source who has examined a claimant is, however, generally entitled to more weight than the opinion of a source who has not examined a claimant. See 20 C.F.R. 404.1527(d).

impairments and/or his consideration of the combination of Plaintiff's impairments are supported by substantial evidence.

## **CONCLUSION**

The Commissioner's decision is not supported by substantial evidence. This action should be remanded to the Commissioner to fully consider the opinions of Plaintiff's treating physicians (Dr. Jones and Dr. Coleman) and to consider all of Plaintiff's impairments both singly and in combination in light of all the evidence.

RECOMMENDED that the Commissioner's decision be **reversed** pursuant to sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3) and that the case be **remanded** to the Commissioner for further administrative action as set out above.

Joseph R. McCrorey
United States Magistrate Judge

February 10, 2011
Columbia, South Carolina